IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MELISSA LYNN KERNS,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:19cv00034 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Melissa Lynn Kerns, ("Kerns"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. § 423 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is

evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Kerns protectively filed her application for DIB on August 29, 2016,[1] alleging disability as of February 25, 2016, based on residuals from a back injury; leg pain; a benign brain tumor; severe headaches; double vision; vertigo; anxiety; and depression. (Record, ("R."), at 11, 1282-83, 1314, 1356.) The claim was denied initially and upon reconsideration. (R. at 1192-94, 1198-1200, 1203-06, 1208-10.) Kerns then requested a hearing before an administrative law judge, ("ALJ"). (R. at 1211-12.) The ALJ held a hearing on March 8, 2018, at which Kerns was represented by counsel. (R. at 1096-1127.)

By decision dated October 30, 2018, the ALJ denied Kerns's claim. (R. at 11-22.) The ALJ found that Kerns met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2018.[2] (R. at 13.) The ALJ found that Kerns had not engaged in substantial gainful activity since February 25, 2016, the alleged onset date. (R. at 13.) The ALJ determined that, through the date last insured, Kerns had severe impairments, namely epidermoid cyst of the brain; degenerative disc disease; migraine headaches; anxiety; and depression, but he found that Kerns did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

---

[1] Kerns filed a prior application for DIB benefits on March 22, 2013, which was denied by final Agency decision on September 19, 2014. (R. at 1131-45.)

[2] Therefore, Kerns must show that she was disabled between February 25, 2016, the alleged onset date, and June 30, 2018, the date last insured, in order to be eligible for benefits.

(R. at 14-15.) The ALJ found that, from February 25, 2016, through October 17, 2016, Kerns had the residual functional capacity to perform simple, routine sedentary[3] work that required no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling; no climbing of ladders, ropes or scaffolds; no more than occasional exposure to pulmonary irritants, temperature extremes, vibration and loud noise; no more than occasional interaction with the public; no more than frequent interaction with co-workers; no more than occasional changes in the routine work setting; and she would be absent two or more times monthly. (R. at 15.) The ALJ found that Kerns was unable to perform any of her past relevant work. (R. at 18.) In addition, from February 25, 2016, through October 17, 2016, based on Kerns's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found there were no jobs existing in significant numbers in the national economy that Kerns could perform. (R. at 18-19.) However, the ALJ found that Kerns was not under a disability during this time because her disabling limitations did not persist for a consecutive 12-month period. (R. at 22.) The ALJ found that, from October 17, 2016, through the date last insured, Kerns had the residual functional capacity to perform simple, routine light[4] work that did not require more than occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling; no climbing of ladders, ropes or scaffolds; no more than occasional exposure to pulmonary irritants, temperature extremes, vibration and loud noise; no more than occasional interaction with the public; no

_____

[3] Sedentary work involves lifting items weighing no more than 10 pounds at a time and occasionally lifting or carrying items like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2020).

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2020).

more than frequent interaction with co-workers; and no more than occasional changes in the routine work setting. (R. at 19.) Again, the ALJ found that Kerns could not perform any of her past relevant work. (R. at 20.) However, he found that, from October 17, 2016, through the date last insured, based on Kerns's age, education, work history and residual functional capacity and the testimony of a vocational expert, there were jobs existing in significant numbers in the national economy that she could perform. (R. at 21-22.) Thus, the ALJ concluded that Kerns was not under a disability as defined by the Act and was not eligible for DIB benefits at any time from February 25, 2016, through the date last insured. (R. at 22.) *See* 20 C.F.R. § 404.1520(g) (2020).

After the ALJ issued his decision, Kerns pursued her administrative appeals, (R. at 1273-74), but the Appeals Council denied her request for review. (R. at 1-6.) Kerns then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2020). This case is before this court on Kerns's motion for summary judgment filed January 3, 2020, and the Commissioner's motion for summary judgment filed February 28, 2020.

## II. Facts

Kerns was born in 1975, (R. at 1100, 1282), which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). She earned a general educational development, ("GED"), diploma. (R. at 1101.) Kerns has past work experience as a bakery clerk, a grocery store cashier, a collection clerk, a taxi starter, an EMS radio dispatcher and a medical assistant in a medical office. (R. at 1122-23, 1315.) Kerns testified at her hearing that she last worked in February 2016 as a bakery clerk. (R.

at 1103.) She left work due to a back injury, which occurred from lifting a box of produce. (R. at 1103, 1107.) Kerns stated bending caused great pain and shaking. (R. at 1107.) She stated the shaking was caused by pain, weakness and instability. (R. at 1108.) She testified that, although Dr. Helms had prescribed Neurontin for leg pain and shaking, it did not help, and it made her very groggy. (R. at 1107.) She stated Dr. Helms had not recommended further back surgery. (R. at 1107.) Kerns testified she last used pain medications about two years previously, and she currently used only over-the-counter pain medications, in addition to a heating pad, ice packs and lying down to relieve her pain. (R. at 1110-11.) She estimated she had to lie down about five hours daily for the prior few months. (R. at 1111.) Kerns testified she had to sleep in a recliner nightly, as she could not sleep in a bed. (R. at 1113.)

Kerns also testified she had a brain tumor in early 2000, which was partially removed by a neurosurgeon. (R. at 1112.) She stated it had begun to regrow and was causing severe headaches, vertigo and distorted speech. (R. at 1112.) Kerns described her headaches as debilitating, and she reported having them twice weekly or more, lasting for one to two days and requiring her to sleep in a dark place. (R. at 1112-13.) Kerns testified she attempted to work a part-time café job in August and September 2017, but missed work at least once weekly due to these headaches. (R. at 1102, 1113.) She testified she was not receiving treatment for her headaches, but the tumor would be removed when it began pressing more, which she would know. (R. at 1114.) Kerns stated she had no insurance. (R. at 1114.) She testified she had vertigo daily, which sometimes made her sick, and affected her ability to drive. (R. at 1114-15.) Kerns further testified her brain tumor caused one to two seizures monthly during which she "shut down" and would "stare off into space." (R. at 1116-17.) She previously took Topamax for seizures, but no longer did so because she could not afford to see a doctor. (R. at 1117.) Kerns testified stress, such as driving,

worsened her seizures. (R. at 1117.)

Kerns testified she did nothing around the house, reporting an inability to reach down to her front load laundry machines, mop and take out garbage. (R. at 1108.) She stated she could wash dishes for about 10 minutes before she would begin to shake all over, and she did not do a lot of cooking. (R. at 1108-09.) She stated her husband did the shopping and paid the bills. (R. at 1115.) Kerns testified she read during the day, but she had to move around a lot. (R. at 1111.) She estimated she could walk for 20 minutes on level ground; sit for 20 minutes, but had to move a little bit constantly due to pain; and lift and carry five to eight pounds. (R. at 1109-10.) Kerns testified driving made her very anxious, and she drove only when necessary. (R. at 1109.) She stated driving also made her legs shake, and she feared she would let go of the brake. (R. at 1109.) Kerns testified she had about one "good day" weekly, which she described as having no back and head pain, having no vertigo and being able to move around. (R. at 1115.) She testified she had at least two "bad days" weekly, which she described as having a severe headache and being dizzy. (R. at 1116.)

Mark Hileman, a vocational expert, also was present and testified at Kerns's hearing. (R. at 1122-26.) He classified Kerns's past work as a bakery clerk as medium[5] and semi-skilled; as a grocery store cashier as light and semi-skilled, but medium as performed; as a collection clerk as sedentary and skilled; as a taxi starter and an EMS radio dispatcher as sedentary and semi-skilled; and as a medical assistant in a medical office as light and skilled. (R. at 1122-23.) Hileman testified

---

[5] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2020).

that either of the following conditions would, in and of themselves, preclude competitive employment: being off task 15 percent of the workday in addition to normal breaks and normal expected time off task; or being absent from work two or more times monthly on a regular and ongoing basis. (R. at 1123.) Hileman testified that a hypothetical individual of Kerns's age, education and work history, who had the residual functional capacity to perform simple and routine light work, and who could occasionally climb ramps or stairs, stoop, kneel, crouch and crawl; never climb ladders or scaffolds; occasionally tolerate exposure to dust, fumes, odors and pulmonary irritants, vibration, temperature extremes and loud noise; respond appropriately to occasional changes in a routine work setting; occasionally interact with the public in work situations; and frequently interact with co-workers in work situations, could not perform any of Kerns's past work. (R. at 1123-24.) However, Hileman testified such an individual could perform other jobs existing in significant numbers in the national economy, including those of a small parts assembler, a routing clerk and a garment folder and packager. (R. at 1124-25.) Hileman next testified that the same hypothetical individual, but who could perform sedentary work, could not perform any of Kerns's past work, but could perform jobs existing in significant numbers in the national economy, including those of an addressing clerk, a production assembler and a stuffer. (R. at 1125.)

In rendering his decision, the ALJ reviewed medical records from Wellmont Holston Valley Medical Center, ("Holston Valley"); Clinchfield Family Medicine, PLLC, ("Clinchfield"); Wellmont Bristol Regional Medical Center, ("Bristol Regional"); Highlands Neurosurgery, P.C.; East TN Brain and Spine Center, PC, (East TN Brain & Spine"); 1st Step Rehab; Holston Medical Group, ("HMG"), Occupational Medicine; Howard S. Leizer, Ph.D., a state agency psychologist; Dr. Jack Hutcheson, M.D., a state agency physician; Jeannie Berger, Ph.D., a state

agency psychologist; and Dr. Richard Surrusco, M.D., a state agency physician. Kerns's counsel also submitted additional medical records from Neurosurgical Associates; Mountain Region Family Medicine Center; HMG Urgent Care; Holston Valley; and Bristol Regional to the Appeals Council.[6]

Kerns has a history of surgical removal of an epidermoid cyst[7] from the cerebellar pontine angle of the brain on the right in April 2001. (R. at 1425, 1635.) She did very well with this surgery and the post-operative period. (R. at 1425.) An MRI of the brain dated February 23, 2015, showed an epidermoid gradually increasing in size since 2010 with mild mass effect on the brainstem, but no hydrocephalus identified. (R. at 1642-43.) At a follow-up appointment at East TN Brain & Spine, on February 26, 2015, Wes Perry, P.A., a physician assistant, reviewed the results of the MRI with Kerns. (R. at 1635-36.) Kerns noted some ringing in her right ear and daily headaches, but a neurologic exam was essentially normal with normal cranial nerves, normal gait pattern and no evidence of cerebellar dysfunction. (R. at 1635-36.) Perry diagnosed epidermoid cyst of the brain, and he referred her to Dr. Corradino to discuss the appropriateness of radiation. (R. at 1636.) On March 20, 2015, Kerns's neurologic exam, again, was normal, and Bailey Qualls, P.A., another physician assistant, noted that Dr. Corradino did not recommend surgical intervention. (R. at 1638.)

---

[6] The Appeals Council is required to consider new evidence relating to the period prior to the ALJ's decision in determining whether to grant review. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 95 (4th Cir. 1991). Here, the Appeals Council found some of the evidence submitted to it did not demonstrate a reasonable probability that it would have changed the outcome of the ALJ's decision, while the remaining evidence did not relate to the period at issue. (R. at 2.) On appeal, this court will consider the first category of evidence, but not the second.

[7] An epidermoid tumor or cyst typically is a benign, slow growing tumor that can occur in various structures of the skull, spine and brain when normal development cells are trapped within the growing brain. *See* uclahealth.org/neurosurgery/epidermoid-tumor (last visited Mar. 8, 2021).

On February 25, 2016, Kerns was seen at HMG Occupational Medicine for a workers' compensation assessment after injuring her back that morning lifting a box of cabbage. (R. at 1629.) She stated she felt a pop in her lower back and had mid to low back pain. (R. at 1629.) Kerns stated she tried to walk off the pain, and then she felt weakness in her right leg, after which burning, tingling and numbness from the right hip down the leg began. (R. at 1629.) On examination, she had tenderness of the lower lumbar region and the sacroiliac region on the right; extension was limited; and rotation at the waist was limited to the left. (R. at 1630.) She was diagnosed with right lumbar radiculopathy, and she received Tramadol and a steroid injection. (R. at 1631.) Kerns was allowed to return to work the following day, but was restricted to lifting no more than 15 pounds, no bending or stooping, no climbing, no prolonged static periods and to walk at least every 30 minutes. (R. at 1628, 1631.) X-rays of Kerns's lumbar spine, taken that day, showed mild disc space narrowing and slight anterolisthesis at L4-L5. (R. at 1633.)

Kerns saw her primary care physician at Clinchfield on March 2, 2016, reporting back pain radiating into her legs and interfering with her work, although it was slowly improving. (R. at 1565, 1567.) She reported Tramadol was not really helping, but she declined any other medications. (R. at 1567.) Kerns also complained of worsened headaches related to her brain tumor with associated visual disturbances. (R. at 1567.) Kerns stated Topamax helped previously, but she had not taken it in about a year due to a lack of insurance. (R. at 1567.) On examination, Kerns ambulated normally with a normal gait and station, she had normal muscle strength and tone with normal movement of all extremities, cranial nerves and sensation were intact, she had normal curvature of the thoracolumbar spine, and she had varicosities and mild edema in both lower extremities. (R. at 1568-69.) Kerns was anxious with abnormal recent and remote memory, but she was alert and fully

oriented with good judgment. (R. at 1568.) Dr. Holly C. Grigsby, M.D., diagnosed her with migraines; amnesia; generalized anxiety disorder; and major depressive disorder, single episode, unspecified. (R. at 1569.) She prescribed Topamax, and she encouraged Kerns to seek counseling. (R. at 1569.)

On March 7, 2016, Kerns returned to HMG Occupational Medicine, reporting continued right-sided back pain radiating into the thigh to above the knee. (R. at 1624.) She stated it sometimes felt like her leg would give way like a bad charley horse in her thigh. (R. at 1624.) Kerns stated Tramadol did not help. (R. at 1624.) On examination, Kerns was alert and cooperative; her posture was stooped; she had tenderness of the mid and lower lumbar spine and the right sacroiliac region; extension was limited; rotation at the waist was limited to the left; straight leg raise testing was positive on the right; there was a large spasm on the right side of the thoracic spine; and palpation of the spasm was tender and resulted in increased pain. (R. at 1625.) Kerns continued to be diagnosed with right lumbar radiculopathy, and she was prescribed Lortab and Robaxin. (R. at 1626.) She was restricted to lifting no more than 10 pounds, no bending, stooping or climbing, performing sedentary/seat duties only, she must avoid prolonged static periods, and she must talk a short walk every 30 minutes. (R. at 1623, 1626.) On March 14, 2016, Kerns stated her back was "not good today," reporting continued radiating back pain, which the Robaxin helped some. (R. at 1621.) Kerns's examination was the same as her previous visit, except a moderate spasm in the lower part of the back on the right side also was noted. (R. at 1622.) Her diagnosis, medications and work restrictions remained unchanged, and a lumbar MRI was ordered. (R. at 1619, 1622.) This MRI, dated March 15, 2016, showed facet arthritic changes at the L4-L5 level, advanced for Kerns's age, with an associated minimal degenerative grade 1 anterolisthesis; bilateral facet joint edema; minimal left lateral protrusion and small degenerative

annular fissure at L3-L4; no evidence of disc extrusion, central canal stenosis, conus compression, definitive nerve root compression or intrinsic conus pathology. (R. at 1632.) On March 16, 2016, Kerns continued to complain of radiating back pain. (R. at 1617.) Her examination was unchanged from her prior visit. (R. at 1618.) She continued to be diagnosed with right lumbar radiculopathy, she was continued on Lortab and Robaxin, she was prescribed steroids, and she was referred for a physical therapy consultation. (R. at 1618-19.) Kerns was cleared to return to work on March 21, 2016, with no lifting over 20 pounds, bending and stooping as tolerated and no prolonged static periods. (R. at 1614.) She was scheduled for a two-week course of physical therapy. (R. at 1616.) On March 22, 2016, Kerns reported only mild improvement since her prior appointment. (R. at 112.) She stated she had returned to work the previous day, but she could not stand the pain she was having that day. (R. at 112.) Specifically, Kerns reported low back pain radiating down the right leg with right leg weakness and decreased balance. (R. at 112.) She reported no relief with muscle relaxers or steroids and only minor relief with pain medications. (R. at 112-13.) Kerns stated she was scheduled to begin physical therapy later that week. (R. at 113.) On examination, Kerns was alert and cooperative; her posture was stooped; she had tenderness of the mid and lower lumbar spine and sacroiliac region on the right; lateral bending was limited bilaterally; rotation at the waist was limited bilaterally; there was a moderate spasm on the right side of the thoracic spine, as well as the lower part of the back on the right; and palpation of the spasm was tender and painful. (R. at 113.) Kerns was diagnosed with right lumbar radiculopathy, and she was restricted to sedentary/seat duties only, as well as no prolonged static periods and walking every hour. (R. at 113, 1613.) On April 13, 2016, Kerns reported continued radiating back pain, which she described as continuous. (R. at 1610.) She stated physical therapy provided no relief, and she could hardly stand to wash dishes. (R. at 1610.) On examination, Kerns was alert and cooperative; her posture was

stooped; she had tenderness to the mid and lower lumbar spine, as well as the right sacroiliac region; lateral bending was limited to the right and left; and rotation at the waist was limited to the right and left. (R. at 1611.) Her diagnosis remained the same, and she was continued on Lortab. (R. at 1611.) Kerns was referred to physiatry for possible injections and advanced physical therapy, and also to a neurosurgeon. (R. at 1611.) She was restricted to no lifting more than 15 pounds, no bending or stooping, sedentary/seat duties at least 15 minutes out of every hour, no prolonged static periods and walking every hour. (R. at 1609.)

On April 5, 2016, Kerns returned to Dr. Grigsby with complaints of severe back pain radiating into the right leg; and frequent and severe headaches with visual disturbances. (R. at 1562-63.) Kerns reported no depression. (R. at 1563.) On examination, she ambulated normally with a normal gait and station; motor strength and tone were normal, as well as movement of all extremities; cranial nerves and sensation were grossly intact; there was normal curvature of the thoracolumbar spine, but she had decreased range of back motion; and she had varicosities and mild edema of both lower extremities. (R. at 1564.) Kerns was anxious with abnormal recent and remote memory, but she was alert and fully oriented with good judgment. (R. at 1564.) Dr. Grigsby diagnosed migraine, amnesia and low back pain, and she continued her on Topamax and narcotic pain medication. (R. at 1563-64.)

Kerns saw Dr. Jody B. Helms, M.D., at Highlands Neurosurgery PC, on April 18, 2016, for back and right leg pain. (R. at 1606-07.) She reported any type of motion or twisting worsened her pain, which was worst in the right lower back. (R. at 1606.) Kerns stated she also had discomfort with burning in the back and side of the right thigh. (R. at 1606.) She stated her pain significantly affected her daily activities, and washing dishes was "torture." (R. at 1606.) Kerns reported she was

taking Lortab, and she had taken steroids and anti-inflammatories, which did not help much. (R. at 1606.) She also stated physical therapy was not helpful.[8] (R. at 1606.) Dr. Helms noted Kerns was alert and fully oriented, and she got up from the seated position fairly easily, her gait was normal and smooth, and she favored neither leg. (R. at 1607.) Lumbar examination revealed diffuse tenderness throughout to palpation, and range of motion was somewhat self-limiting secondary to pain. (R. at 1607.) Kerns had full range of motion of both lower extremities; straight leg raise testing was negative, bilaterally, but caused some back discomfort; strength in both legs was full; sensation in both legs was intact; and reflexes were normal. (R. at 1607.) Dr. Helms reviewed the MRI from March 15, 2016, but stated he did not agree with the finding of facet arthritic changes that were advanced for Kerns's age. (R. at 1607.) Instead, he found that the MRI showed some mild age-related degenerative changes and no evidence of acute anatomical disturbances. (R. at 1607.) Given Kerns's continued complaints despite conservative measures, he ordered a lumbar myelogram with post-CT scan and a right lower extremity EMG/nerve conduction study. (R. at 1607.) Dr. Helms also noted he had returned Kerns to physical therapy. (R. at 1607.) On April 21, 2016, the lumbar myelogram with post-CT scan showed minimal anterolisthesis of L4 over L5 secondary to facet arthrosis, as well as mild canal narrowing at this same level. (R. at 1490.)

On April 26, 2016, Kerns saw Dr. William M. Platt, M.D., for the EMG/nerve conduction study of the right lower extremity. (R. at 1608.) Testing showed extremely mild acute denervation in the flexor digitorum longus and extensor hallucis, consistent with an L5-S1 or sciatic axonal radiculitis. (R. at 1608.) However, definite radiculopathy could not be diagnosed due to paucity of findings.

---

[8] The record shows that, prior to her back surgery, Kerns underwent physical therapy at 1st Step Rehab from March 25, 2016, through July 11, 2016. (R. at 1713-1859.)

(R. at 1608.) Dr. Platt described the study as "mildly abnormal," and he recommended clinical correlation. (R. at 1608.)

On April 28, 2016, Kerns returned to Dr. Helms, reporting continued severe right lower extremity pain with any type of activity. (R. at 1605.) On examination, she was tearful at times; she favored her right lower extremity slightly; she had some signs of a positive right-side straight leg raise; she had full strength; and her reflexes were normal. (R. at 1605.) Dr. Helms noted that the lumbar myelogram with post-CT scan showed degeneration at the L4-L5 segment with a grade 1 spondylolisthesis and some mild stenosis at the L4-L5 level secondary to the listhesis and facet arthropathy. (R. at 1605.) He noted that the EMG/nerve conduction study showed a mild right L5-S1 irritation that did not meet the criteria for a true radiculopathy. (R. at 1605.) Dr. Helms noted that potential surgery with a posterior lumbar interbody fusion was an option, but it was too early to make that type of decision. (R. at 1605.) Instead, he wanted Kerns to begin physical therapy, and he ordered a right-sided L4-L5 epidural injection to try to calm the nerve irritation. (R. at 1605.) On this day, Dr. Helms excused Kerns from work until May 26, 2016, due to physical therapy and the upcoming epidural injection. (R. at 1603.)

On May 19, 2016, Dr. Platt performed a right L5-S1 interlaminar epidural injection. (R. at 1541-42.) Later that day, Kerns presented to the emergency department at Holston Valley with complaints of headaches with vomiting. (R. at 1392-93.) She reported undergoing the injection earlier in the day. (R. at 1393, 1395.) Kerns was alert and fully oriented, and her physical examination was completely normal. (R. at 1394.) She was diagnosed with a spinal tap headache and advised to increase fluids as well as some caffeine. (R. at 1395.) Kerns received Tramadol and Phenergan and was discharged home. (R. at 1395.)

-14-

Kerns returned to Dr. Helms on May 25, 2016, reporting no improvement with the epidural or with physical therapy. (R. at 1602.) On examination, Kerns was alert, fully oriented and cooperative; she got up and ambulated fairly well; she had some tenderness in the lower lumbar spine area, more on the right side; she had a mild degree of leg pain with straight leg maneuvers; and her strength and sensation were intact. (R. at 1602.) Again, Dr. Helms noted the "very mild" findings on the EMG, for which he would not recommend surgical intervention. (R. at 1602.) He prescribed Gabapentin to try to calm the nerve, and he prescribed Norco. (R. at 1602.) Dr. Helms increased Kerns's physical therapy to daily, and he excused her from work until June 23, 2016. (R. at 1601-02.) When she returned on June 23, 2016, Kerns reported continued and constant pain in her leg, but she reported her back was doing "quite well." (R. at 1600.) Kerns stated Gabapentin made her feel sick and uncomfortable sometimes, and she was taking Norco three times daily. (R. at 1600.) On examination, Kerns had positive straight leg raise testing on the right, but her strength and sensation were intact. (R. at 1600.) Dr. Helms discussed her options, including surgery, another epidural injection and medication management. (R. at 1600.) He asked Kerns to speak with her family and decide how to proceed. (R. at 1600.) Dr. Helms kept Kerns out of work until July 11, 2016. (R. at 1599.)

On July 12, 2016, Dr. Helms performed a right L4-5 translaminar interbody fusion for stabilization of spondylolisthesis without complication. (R. at 1401-02, 1507-10.) Kerns was discharged the following day in stable condition with prescriptions for Percocet and Zanaflex, and she was instructed to ambulate as tolerated. (R. at 1401-02, 1505-06.) Dr. Helms excused Kerns from work until August 25, 2016. (R. at 1596.) Kerns returned to Dr. Helms's office on August 1, 2016, for a post-operative follow up. (R. at 1538.) She reported doing better with her back and leg pain, with some mild residual right leg discomfort. (R. at 1538.) Kerns

was taking no pain medication at that time. (R. at 1538.) On examination, she moved all extremities; grip was symmetrical; Hoffman's signs were negative; reflexes were slightly hypoactive throughout; toes were downgoing; dorsiflexion and plantar flexion were intact; gait was slightly guarded; there were no signs of spasticity or myelopathy cranial nerves were grossly intact; and the lumbar incision was mending well. (R. at 1538.) Kerns was alert and followed commands. (R. at 1538.) Brian Killen, P.A., a physician assistant, reassured Kerns she was making good progress, and he advised her to walk, stretch and be active within reason. (R. at 1538.) When she returned on August 25, 2016, she was doing well, despite getting a stinging pain in her back at times and some discomfort down the right leg, which was slightly better. (R. at 1595.) On examination, Dr. Helms noted Kerns's incisions were healing nicely; there was appropriate tenderness in that area; straight leg raise testing was normal; and strength was intact. (R. at 1595.) X-rays of Kerns's lumbar spine, taken that day, showed intact hardware at the L4-L5 level, the spondylolisthesis had been fully reduced, and there was good disc space height. (R. at 1464, 1595.) Dr. Helms noted he had placed Kerns into physical therapy[9] for a month, and he excused her from work until September 19, 2016. (R. at 1593, 1595.) On September 19, 2016, Dr. Helms, again, noted Kerns was doing well from surgery, although she continued to complain of some back pain and right lower extremity pain. (R. at 1592.) He further noted her right leg tended to worsen after therapy, and she had been taking Norco two to three times daily, depending on her therapy. (R. at 1592.) Kerns continued to have some trouble bending over and sleeping. (R. at 1592.) On examination, Kerns was alert, fully oriented and cooperative; she rose from a seated position easily; her back incision was healed very well; she had some discomfort in her leg with straight leg raise testing; and she had full strength and sensation and

---

[9] Following her surgery, Kerns underwent physical therapy from August 29, 2016, to November 2, 2016. (R. at 1644-1712.)

normal reflexes. (R. at 1592.) Dr. Helms prescribed Gabapentin and Norco, he continued physical therapy for another month, and he excused her from work until October 17, 2016. (R. at 1591-92.) When Kerns returned on October 17, 2016, she complained of right buttock and leg pain, and she stated physical therapy worsened her pain. (R. at 1590.) Kerns stated she had reduced her pain medicine to once daily after her therapy session, and, sometimes the day following therapy. (R. at 1590.) On examination, she rose from a seated position very easily; she ambulated without much difficulty; straight leg raise testing on the right produced some mild discomfort; she had full strength; and sensation was intact. (R. at 1590.) Dr. Helms noted Kerns was doing well from her surgery, although she had some residual radicular discomfort. (R. at 1590.) He continued her on Gabapentin and physical therapy three times weekly, and he released her to work at that time with restrictions of lifting no more than 15 pounds. (R. at 1589-90.) On that date, an x-ray of Kerns's lumbar spine showed post-operative changes, but no acute findings. (R. at 1558.)

On November 1, 2016, Howard S. Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), finding Kerns was mildly restricted in her activities of daily living and in maintaining social functioning; experienced moderate difficulties in maintaining concentration, persistence or pace; and had experienced no repeated episodes of extended-duration decompensation. (R. at 1157-58.) Leizer also completed a mental residual functional capacity assessment[10] of Kerns, finding she was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a

---

[10] Leizer indicated that both the PRTF and the mental assessment were "current" evaluations of Kerns's abilities/limitations. (R. at 1157, 1164.)

consistent pace without an unreasonable number and length of rest periods; and to respond appropriately to changes in the work setting. (R. at 1164-65.) In all other areas, Leizer opined Kerns was not significantly limited. (R. at 1164-65.) He specifically opined Kerns could maintain attention and concentration for two-hour periods, and she had no more than mild limitations in social interaction. (R. at 1165.) Leizer concluded she was capable of simple, unskilled work. (R. at 1165.)

Also, on November 1, 2016, Dr. Jack Hutcheson, M.D., a state agency physician, completed a physical residual functional capacity assessment of Kerns for the period from February 25, 2016, to July 11, 2016.[11] (R. at 1160-61.) He opined Kerns could perform light work with occasional climbing, stooping, kneeling, crouching and crawling, unlimited balancing and no concentrated exposure to hazards like machinery and heights. (R. at 1160-61.) Dr. Hutcheson also completed a physical residual functional capacity assessment for the period "12 Months After Onset: 07/12/2017."[12] (R. at 1162-63.) The findings in this residual functional capacity assessment mirrored those of Dr. Hutcheson's first assessment. (R. at 1162-63.)

Kerns returned to Dr. Helms on November 9, 2016, stating she had worked three days. (R. at 1588.) She also reported she was performing exercises at home, although her physical therapy was discontinued. (R. at 1588.) Kerns reported that at rest and after exercising, she had very little back pain, and her leg pain had pretty much gone away. (R. at 1588.) She stated that, after working a couple of days, by the end of the day, she had a lot of back soreness after repeatedly bending over during

---

[11] This is the period from Kerns's alleged onset date to the day prior to her back surgery.

[12] This was one year after the date of Kerns's back surgery.

the workday, but this improved. (R. at 1588.) On examination, Kerns had some minimal tenderness in her paraspinous muscles around her incisions, which were well-healed; and she had full strength and sensation in both legs. (R. at 1588.) Dr. Helms stated that Kerns's radicular complaints were "near resolved," and he noted she continued to take Gabapentin at night, but she no longer took any pain medications. (R. at 1588.) He discontinued therapy, and he continued the 15-pound weight restriction for the time being. (R. at 1588.) On December 21, 2016, Kerns advised Dr. Helms that her leg pain was "gone," and she did not have much back pain at rest. (R. at 1587.) She stated her back pain increased with activity. (R. at 1587.) On examination, she was alert, fully oriented and cooperative, with full strength and sensation in the legs. (R. at 1587.) She rated her pain as a zero. (R. at 1587.) X-rays of Kerns's lumbar spine from that day showed intact hardware with no evidence of failure, and there appeared to be some beginnings of fusion. (R. at 1587.) Dr. Helms concluded Kerns was doing well from her fusion, and he opined Kerns was at her maximum medical improvement. (R. at 1586-87.) That being the case, he released her to return to her pre-injury work without restrictions at that time and to return on an as-needed basis. (R. at 1586-87.)

On January 18, 2017, Jeannie Berger, Ph.D., a state agency psychologist, completed a PRTF, finding Kerns was moderately limited in her ability to understand, remember or apply information; to interact with others; and to concentrate, persist or maintain pace; and mildly limited in her ability to adapt or manage oneself. (R. at 1177-78.) Berger also completed a mental residual functional capacity assessment[13] of Kerns, finding she was moderately limited in her ability to understand, remember and carry out detailed instructions; to maintain attention and

---

[13] In both the PRTF and the mental assessment, Berger indicated they were "current" evaluations of Kerns's abilities/limitations. (R. at 1177, 1184.)

concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to respond appropriately to changes in the work setting. (R. at 1184-86.) In all other areas, Kerns was not significantly limited. (R. at 1184-86.) Berger specified that Kerns could complete simple, repetitive tasks; complete simple, one- to two-step procedures in two-hour blocks of time with regular breaks; perform work in a setting that did not require frequent or prolonged interaction with the public or large groups of co-workers; and adapt to changes with advance notice. (R. at 1184-86.) Berger concluded Kerns could sustain competitive employment. (R. at 1186.)

Also, on January 18, 2017, Dr. Richard Surrusco, M.D., a state agency physician, completed two physical residual functional capacity assessments of Kerns. (R. at 1180-84.) The first assessment covered the period from February 25, 2016, through July 11, 2016, and the second assessment was for 12 months after the onset date, or July 12, 2017. (R. at 1180, 1182.) In both assessments, Dr. Surrusco opined Kerns could perform light work with occasional climbing, stooping, kneeling, crouching and crawling and unlimited balancing, and she must avoid concentrated exposure to temperature extremes, noise, vibration and fumes, odors, dusts, gases and poor ventilation. (R. at 1180-84.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2020). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires

the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2020).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Kerns argues that the ALJ failed to appropriately address in his decision what time periods she was unable to work. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11.) She argues that the ALJ's error precludes a meaningful review of his decision, as it is impossible for this court to determine whether substantial evidence supports it. (Plaintiff's Brief at 11-13.)

In the ALJ's decision, he rendered residual functional capacity findings as to two discrete periods of time. First, he made a finding for the period of February 25, 2016, through October 17, 2016, as set out in Finding No. 5 in his decision. (R. at 15.) The ALJ found that, for this time period, Kerns could not perform any of her past relevant work, (Finding No. 6; R. at 18), and she could not perform any other jobs existing in significant numbers in the national economy. (Finding No. 10; R. at 18-19.) In the bold heading of Finding No. 10, the ALJ indicates his finding relates to this period. However, in the narrative portion of Finding No. 10, the ALJ twice refers to the time period of October 18, 2016, through January 1, 2018. (R. at 19.) However, he refers to the period of February 25, 2016, through October 17, 2016, once in the narrative portion, as well, stating, "Based on the testimony of the vocational expert, the undersigned concludes that from … February 25, 2016 through October 17, 2016, the claimant was unable to make a successful vocational adjustment to work that existed in significant numbers in the national economy." (R. at 19.) Nonetheless, in Finding No. 17, the ALJ found Kerns was not under a disability from February 25, 2016, to October 17, 2016, because her disabling limitations did not last for a consecutive 12-month period. (R. at 22.) The ALJ also made a residual functional capacity finding for the period from October 17, 2016, through the date last insured, as set out in Finding No. 11. (R. at 19.) The ALJ found that, for this time period, Kerns could not perform any of her past relevant work, but she could perform other jobs existing in significant numbers in the national

economy. (R. at 20-22.)

Kerns argues that, because the ALJ twice referenced the time period from October 18, 2016, to January 1, 2018, in the narrative portion of Finding No. 10, it is impossible to determine the time period the ALJ found she was unable to work. According to Kerns, without a clearer explanation of the ALJ's rationale for these inconsistencies in his decision, "it is simply impossible to tell whether there was substantial evidence to support the determination." (Plaintiff's Brief at 12); *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986). Additionally, Kerns argues that the inadequacies in the ALJ's analysis frustrate a meaningful review by this court. (Plaintiff's Brief at 12-13); *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015). While I am not persuaded by Kerns's arguments on this issue, I find that the ALJ's decision should be vacated and Kerns's claim remanded because the decision that she was not disabled beginning October 17, 2016, is not supported by substantial evidence.

The ALJ found that, beginning October 17, 2016, and continuing through her date last insured, June 30, 2018, Kerns was able to perform a limited range of light work. (R. at 19-20.) In reaching this conclusion, the ALJ stated he was giving Kerns's treating neurosurgeon, Dr. Helms, "significant weight." (R. at 20.) On October 17, 2016, Dr. Helms released Kerns to return to work, but he restricted her to lifting no more than 15 pounds. (R. at 1589-90.) Dr. Helms did not remove this lifting restriction until December 21, 2016, when he released Kerns to return to work with no restrictions. (R. at 1586-87.)

Furthermore, the record contains no evidence contradicting Dr. Helms's opinion for the period prior to December 21, 2016. On November 1, 2016, state

agency physician Dr. Hutcheson opined that, *as of July 12, 2017*, a year following the date of her back surgery, Kerns would be able to perform light work with occasional climbing, stooping, kneeling, crouching and crawling, unlimited balancing, and she must avoid concentrated exposure to hazards like machinery and heights. On January 18, 2017, state agency physician Dr. Surrusco opined that, *as of July 12, 2017*, Kerns would be able to perform light work with occasional climbing, stooping, kneeling, crouching and crawling, unlimited balancing, and she must avoid concentrated exposure to temperature extremes, noise, vibration and fumes, odors, dusts, gases and poor ventilation. Based on this evidence, I find that substantial evidence does not exist in the record to support the ALJ's residual functional capacity assessment, restricting Kerns to light work with no more than occasional climbing of ramps and stairs, stooping, kneeling, crouching and crawling and no climbing of ladders, ropes or scaffolds as of October 17, 2016.

Based on all the above, I find that substantial evidence does not exist in the record to support the ALJ's finding that Kerns was not disabled. I will vacate the ALJ's decision and remand Kerns's claim to the Commissioner for further development. An appropriate Order and Judgment will be entered.

DATED:     March 8, 2021.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE